**EASTERN KENTUCKY RESOURCES, et al., Plaintiffs–Appellants,**

v.

**The FISCAL COURT OF MAGOFFIN COUNTY, KENTUCKY, et al., Defendants–Appellees.**

No. 95–6360.

United States Court of Appeals, Sixth Circuit.

Argued March 21, 1997.

Decided Oct. 15, 1997.

534

Richard A. Getty (argued and briefed), Walker P. Mayo (briefed), Bowles, Rice, McDavid, Graff, Love & Getty, Lexington, KY, Leonard Knee (briefed), Bowles, Rice, McDavid, Graff, Love & Getty, Charleston, WV, for plaintiff-appellant Eastern Kentucky Resources.

Richard A. Getty, Walker P. Mayo, Bowels, Rice, McDavid, Graff, Love & Getty, Lexington, KY, for plaintiffs-appellants Blue Ash Development, Inc. and Royalton Resources, Inc.

William Grover Arnett, Magoffin County Attorney, Salyersville, KY, for The Fiscal Court of Magoffin County, Kentucky.

Gordon B. Long, Salyersville, KY, for defendants-appellees Charles E. Hardin, Terry Hensley, Robert Collinsworth and Kenneth Auxier.

Kathryn M. Hargraves (argued and briefed), Kathryn R. Matheny, Karen H. Rippy (briefed), Natural Resources and Environmental Protection Cabinet, Office of Legal Services, Frankfort, KY, for defendants-appellees Paul E. Patton and James E. Bickford.

James J. Grawe, Office of the Attorney General, Civil Division, Frankfort, KY, for defendant-appellee A.B. Chandler, III.

Before: KEITH, MERRITT, and COLE, Circuit Judges.

KEITH, Circuit Judge.

The Plaintiffs, Eastern Kentucky Resources, Blue Ash Development, Inc., and Royalton Resources, Inc., (collectively "EKR") sought a declaratory judgment and injunctive relief in this action challenging the constitutionality of Kentucky's solid waste disposal program. The Defendants are various state officials of the Commonwealth of Kentucky (collectively "the Commonwealth"). EKR appeals the order of the district court dismissing its claims and granting summary judgment to the Commonwealth. For the reasons discussed below, we **AFFIRM**.

### I. STATEMENT OF FACTS

#### A. BACKGROUND

In 1990, Wallace G. Wilkinson, then-Governor of Kentucky convened a special legislative session, the 1991 Extraordinary Session, on garbage. The district court found that there were many events that led to this legislative session. These included poor collection practices, which had resulted in continued open dumping, the existence of environmental hazards, concerns for the amount of garbage generated per person in the Commonwealth, the fear that the Commonwealth was running out of garbage space as a result of the rapid rate at which existing landfills were filling up, and concern with the amount of refuse imported outside of the Commonwealth's borders. At the time that the ses-

sion was convened, the Commonwealth had declared an environmental state of emergency because of the deplorable effects caused by the ineffectiveness of its then-current waste disposal program. EKR, however, maintains that the Extraordinary Session was convened, almost exclusively, because of the Commonwealth's opposition to the importation of out-of-state waste.

### B. THE COMMONWEALTH'S WASTE MANAGEMENT PROGRAM

On February 21, 1991, at the 1991 Extraordinary Session, the Kentucky General Assembly enacted Senate Bill 2 ("SB 2"). SB 2 establishes a comprehensive and integrated waste management program designed to reduce the amount of solid waste disposal facilities in the Commonwealth, and to encourage a regional approach to solid waste management. SB 2 contains sixty-three parts addressing a variety of solid waste-related subjects, including garbage reduction strategies, issuance of landfill permits, state and local solid waste planning, garbage collection, tax incentives for recycling, and public participation in local solid waste planning.

SB 2 has three primary elements. First, local planning areas are required to offer universal refuse collection as part of the Commonwealth's goal to reduce—if not eliminate—illegal dumping, and to provide Kentuckians with maximum access to collection services. It is the duty of the local planning area to dispose of garbage generated within its area. This can be done by hosting a landfill, or by marketing local garbage outside of the area. Second, the plan contains a prospective element. SB 2 mandates the implementation of various recycling programs in order to reduce the amount of refuse generated per person, as well as to stem the flow of refuse streaming into the Commonwealth's landfills. One of the bill's goals is to reduce by 25% the amount of municipal solid waste generated by Kentuckians by 1997. Third, the legislature imposed upon local governments the duty to plan ahead to assure that adequate disposal capacity exists for waste generated within the Commonwealth, and to account for all available landfill capacity in the Commonwealth.

To accomplish these tasks, local governments were instructed to collaborate and to establish local solid waste planning areas. The purpose of these planning areas are to develop and implement area-wide solid waste management plans. The plans are to include among other requirements: a description of the solid waste disposal site; the recycling and composting facilities available in the area; projections on the area's population growth and waste disposal needs for five, ten, and twenty years, respectively; specific provisions to assure that adequate capacity exists for municipal solid waste generated in the area for a ten year period; and a plan to clean up open dumps in the local planning area. The bill also included a deadline by which plans were to be submitted to the Natural Resources and Environmental Protection Cabinet ("the Cabinet"). A local planning area's failure to submit a plan authorizes the Cabinet to prepare a plan for that area or to place that area in an established planning area. If a local planning area fails to execute a plan, Kentucky agencies are not allowed to endorse any solid waste projects in that area.

The Cabinet is the official planning and management agency of the Commonwealth's solid waste program. It is the duty of the Cabinet to develop a statewide solid waste reduction and management plan. It is primarily responsible for coordinating the solid waste planning and management activities of waste management areas, and for approving waste management facilities. It is the responsibility of the Cabinet to review applications for permits to construct or substantially expand existing municipal solid waste facilities. The Cabinet reviews applications for those permits for consistency with area solid waste management plans. The Cabinet is also authorized to establish standards for the disposal of solid waste in landfills and incinerators, and to require compliance with those standards when issuing permits.

SB 2's distinctive feature is that it conditions the issuance of landfill permits on local solid waste planning rather than design standards as was customarily the practice. Before a would-be landfill developer submits an application for a new landfill or a substantial

expansion of an existing landfill to the Cabinet, the governing body of the local planning area must review the request to ascertain its consistency with local solid waste management plans. SB 2 links the issuance of landfill permits to local solid waste management plans with the goal of requiring government officials, local citizens, and landfill developers to work together on waste-related issues. Once the local planning agency has reviewed the application, the applicant may then submit it to the Cabinet for its approval. The Cabinet is free to accept or reject the local planning agency's determination. However, if it disagrees with the agency's determination, it must make written and detailed findings explicating its reasoning.

## C. THE CONTESTED PROVISIONS

Two parts of SB 2 are at issue in this case: Kentucky Revised Statute Chapter 224 subchapter 40 section 315 ("KRS 224.40–315"), and Kentucky Revised Statute Chapter 224 subchapter 43 section 345 ("KRS 224.43–345") (collectively "the challenged provisions"). KRS 224.40–315 states:

(1) No permit to construct or expand a municipal solid waste disposal facility shall be accepted for processing by the cabinet unless the application contains a determination from the governing body for the solid waste management area in which the facility is or will be located concerning the consistency of the application with the area solid waste management plan submitted under KRS 224.43–345(1)(a) to (d) and (*l*) until January 1, 1993, and the entire plan after January 1, 1993. The governing body for the area shall, within sixty (60) days of receipt of a written request, make the determination after public notice and opportunity for public comment and public hearing. For applications with a notice of intent filed prior to February 26, 1991, the cabinet shall continue to process the appli-

cation but no permit shall be approved until the governing body for the solid waste management area in which the facility is or will be located has made a determination in accordance with this section.

(2) No permit to construct or expand a municipal solid waste disposal facility shall be approved unless the applicant affirmatively demonstrates and the cabinet makes a written finding in the preliminary determination made pursuant to KRS 224.40–310(2)[1] that the application conforms to and is consistent with all of the following:

(a) The capacity needs identified in the area solid waste management plan;

(b) Other elements of the area solid waste management plan, for permit applications filed after approval of those elements;

(c) The statewide solid waste reduction and management plan, for permit applications filed after completion of the plan; and

(d) Applicable zoning regulations adopted pursuant to KRS Chapter 100.

(3) If the cabinet approves a permit to construct or expand a municipal solid waste management facility after the governing body for the area has determined the application to be inconsistent with the area solid waste management plan, as part of the written finding the cabinet shall state in detail the reasons why it did not accept the determination of the governing body for the area.

(4) For the purposes of this section, the term municipal solid waste disposal facility includes, in addition to those facilities defined in KRS 224.01–010(15), any residual or contained landfill or incinerator disposing of industrial solid waste for a fee, but does not include a waste site or facility which is operated exclusively by a solid waste generator on property owned by the solid waste generator which accepts only industrial solid waste from the solid waste

---

1. KRS 224.40–310(2) states:

(2) No permit to construct or expand, when the expansion results in substantial additional capacity, a waste disposal facility shall be issued until a complete application has been submitted to and approved by the cabinet and notice of the application has been published, as provided for in subsections (4) and (5) of this section, at the expense of the applicant in a manner reasonably calculated to inform that portion of the public which is most likely to be affected by the operation of the proposed waste disposal facility. The publication shall take place after the cabinet has determined the application to be technically complete and issued a draft permit.

generator or industrial solid waste generated at another facility owned and operated by the generator or wholly-owned subsidiary.

KRS 224.43–345 states:

(1) Each area solid waste management plan shall be prepared in accordance with administrative regulations to be adopted by the cabinet and shall be required to include the following:

(a) Identification of the area that will be included in the plan;

(b) A demographic study of the planning area of current and projected populations five (5), ten (10) and twenty (20) years in the future. A projection of the amount and source of solid waste generated and requiring disposal at municipal solid waste disposal facilities for each of these time periods shall be provided;

(c) An inventory and description of all existing solid waste management facilities and activities. The description shall include their identity, location, life expectancies, ownership, cost to the users, and level of compliance with state and federal laws. The description is not required to include any solid waste management facility which is operated exclusively by a solid waste generator on property owned by the solid waste generator for the purpose of accepting solid waste from the solid waste generator or waste generated at another facility owned and operated by the generator or wholly-owned subsidiary. After commencement of operation by a solid waste generator of a solid waste disposal facility which is permitted but not included in a solid waste management plan, an amendment to a solid waste management plan shall be required for any solid waste which is to be no longer disposed by the solid waste generator in its own solid waste disposal facility;

(d) An estimate of the area's long-range needs for solid waste management and facilities for five (5), ten (10), and twenty (20) years into the future;

(e) Identification and assessment of current and future solid waste management problems faced by the area. List any deficiencies with existing solid waste management facilities in meeting current and future area needs, and identify opportunities for improvement;

(f) Outline short-term, mid-term, and long-term goals and objectives of the solid waste management area. The goals and objectives shall be consistent with state policies;

(g) Based on the problems, needs, goals, and objectives previously identified, identify alternative approaches to solid waste management and select the optimal alternatives. Solid waste management activities and facilities to be addressed include:

1. Identification of those regulations and ordinances which provide for proper, safe, and sanitary management of solid waste;

2. A description of proposed improvements to existing solid waste collection and transportation systems;

3. Establishment of a siting procedure and development program to assure the orderly location, development, and financing of new or expanded municipal solid waste management facilities. The plan shall demonstrate how all persons in the planning area will within the near future have reasonable opportunity to dispose of their waste in a manner that complies with state and federal laws;

4. Identification of planned programs for the control and cleanup of litter and open dumps. The programs shall include: a schedule for the cleanup of illegal open dump sites which will result in the cleanup of those sites within one (1) year of cabinet approval of the plan; an annual survey of the county to discover new sites which shall then be scheduled for cleanup within one (1) year; and measures to prevent the recurrence of dumping at sites which are cleaned up;

5. An assessment of opportunities to reduce the need for land disposal by banning grass clippings, leaves, and other yard wastes from municipal solid waste disposal facilities and the institution of composting operations for grass clippings, leaves, and other yard wastes;

6. Establishment of a plan to reduce the need for land disposal through waste reduction and recycling, materials recovery, and energy recovery and the provision of opportunities for recycling that may include, but are not limited to, drop-off centers or door-to-door collection. Where recycling or material recovery is not deemed feasible, specific factual analysis shall be provided to support the conclusion; and

7. A description of any proposed recycling, materials recovery, or energy recovery plan or facility;

(h) A five (5) year schedule and description of activities to be undertaken to implement the proposed plan;

(i) A description of short-term costs of the plan including capital and operational costs on a per ton and per capita basis for each element of the plan, and the identification of the means of financing plan implementation;

(j) Designation of the governing body for implementation of the solid waste management plan or components of the plan. A description of its responsibilities and authority shall be provided;

(k) A description of proposed surveillance and enforcement procedures to assure that solid waste in the planning area is properly managed. Identification of modifications to local laws and regulations necessary to implement the area plan;

(l) Specific provisions to assure that adequate capacity for a ten (10) year period shall be available for municipal solid waste generated in the solid waste management area, and identification of any additional capacity authorized for disposal of out-of-area municipal solid waste;

(m) Contractual agreements for use of waste disposal capacity at any municipal solid waste disposal facility inside or outside the waste management area identified and relied upon in the plan;

(n) Provisions to assure achievement of reductions in municipal solid waste requiring disposal, consistent with the goals of KRS 224.43–010;

(o) Establishment of a public information and participation process including the following components;

1. Formation of an advisory committee comprised of local residents, and business and industry representatives;

2. Preparation of a draft plan for public notice and comment;

3. Convening of a public hearing upon request; and

4. Publication of a response to public comments.

(2) The solid waste management plan shall consist of two (2) parts. The first part shall contain the information described in subsection (1)(a) through (1)(d) and (1)(l) of this section and shall be submitted to the cabinet by October 1, 1991. The second part shall contain the information described in subsection (1)(a) through (1)(o) of this section and shall be submitted to the cabinet by January 1, 1993. The cabinet shall approve or disapprove the first part of the plan within thirty (30) days of receipt, and the second part of the plan within one hundred twenty (120) days of receipt.

### D. THE PROPOSED LANDFILL

In 1991, EKR purchased property in Magoffin County to develop a landfill that would accept 4,000 to 10,000 tons of solid waste per day. In December, 1991, EKR successfully negotiated a contract with the former magistrates of the Magoffin County Fiscal Court for the construction of the landfill, the disposal of Magoffin County's garbage in that landfill, and the disposal of solid waste generated outside of Kentucky. As an inducement, EKR offered to close the County's old substandard landfill, provide royalties to the County, as well as free residential garbage collection and disposal for residents of the County. A modified agreement, which excluded residential garbage collection, was later approved by the magistrates.

In August, 1991, the Magoffin Fiscal Court submitted a solid waste management plan to the Cabinet which contemplated the use of EKR's proposed landfill as the disposal site for waste generated by the County's residents. The Cabinet initially approved the plan, but retracted that approval one month later and requested that the plan be revised.

The district court found that the plan was rejected because the Cabinet had identified irregularities in the plan's preparation and submission, including the County's decision to use its existing sub-standard landfill until 1995. EKR, however, maintains that the plan was rejected because of opposition to out-of-state garbage.

In January, 1992, EKR asked the Cabinet to process its landfill application. The Cabinet declined to do so because a local solid plan waste management plan had not yet been approved, as was required by SB 2. The district court found that Magoffin County had not resubmitted a revised local solid waste management plan because of the Fiscal Court's inability to obtain a quorum and because of local resistance to the contract between EKR and the County. The contract was eventually invalidated in a decision by the Clark Circuit Court, which held that the contract violated the Commonwealth's constitutional requirements of public notice and bidding for franchise agreements.

Because Magoffin County failed to resubmit to the Cabinet a solid waste management plan before the statutory deadline, the Cabinet exercised its authority to write a plan for the County. The Cabinet's plan advocated the use of EKR's proposed landfill as the disposal site for the County's waste, but also noted that due to the uncertainties of the then-pending landfill contract litigation, an alternative should be identified if EKR's proposed landfill was not constructed. The County was also given the choice of developing its own plan if it deemed the Cabinet's plan unacceptable.

By November, 1993, the make-up of the Fiscal Court had changed due to resignations, elections, and the death of the county judge-executive. In March, 1994, the new fiscal court submitted a revised solid waste management plan. The plan did not provide for a landfill in Magoffin County. Instead, the County proposed to market all of its garbage for disposal outside the county planning area. In May, 1994, the Cabinet approved the plan.

### E. PROCEEDINGS BEFORE THE DISTRICT COURT

In August of 1994, EKR brought suit in the district court, seeking a declaratory judgment that two provisions of the Commonwealth's waste disposal program—KRS 224.40–315, and KRS 224.43–345—are unconstitutional. EKR also sought to enjoin the Cabinet from enforcing and applying those provisions, and from implementing various companion regulations.

Both parties moved for partial summary judgment. The Commonwealth also filed a motion to dismiss. The district court granted the Commonwealth's motion for partial summary judgment, and denied EKR's motion, on the grounds that the challenged regulations did not violate the Commerce Clause. EKR appeals to this Court.

## II. DISCUSSION

### A. STANDARD OF REVIEW

We review de novo the district court's grant of summary judgment. *Johnson v. United States Postal Serv.*, 64 F.3d 233, 236 (6th Cir.1995). Summary judgment is proper in the absence of genuine issues of material fact. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). We review the district court's findings of fact for clear error. *Downs Mapother & Mapother P.S.C. v. Cooper*, 103 F.3d 472, 476 (6th Cir.1996).

### B. LEGAL FRAMEWORK

Article I, § 8 cl. 3 of the United States Constitution states in part that "Congress shall have the Power ... To regulate Commerce with foreign Nations, and among the several States." "Although the Commerce Clause is by its text an affirmative grant of power to Congress to regulate interstate and foreign commerce, the Clause has long been recognized as a self-executing limitation on the power of the States to enact laws imposing substantial burdens on such commerce." *South–Central Timber Dev. Inc. v. Wunnicke*, 467 U.S. 82, 82, 104 S.Ct. 2237, 81 L.Ed.2d 71 (1984). This self-executing limitation is often referred to as the

"negative" or "dormant" aspect to the Commerce Clause. *Oklahoma Tax Comm'n v. Jefferson Lines Inc.*, 514 U.S. 175, 178–80, 115 S.Ct. 1331, 1335, 131 L.Ed.2d 261 (1995). Consequently, any state regulation of interstate commerce is subject to scrutiny under the dormant Commerce Clause, unless such regulation has been preempted or expressly authorized by Congress.

■ The purpose of the Commerce Clause is to prohibit outright economic protectionism or regulatory measures designed to benefit in-state economic actors by burdening out-of-state actors. *New Energy Co. v. Limbach*, 486 U.S. 269, 273, 108 S.Ct. 1803, 1807, 100 L.Ed.2d 302 (1988). It forbids states from "advanc[ing] their own commercial interests by curtailing the movement of articles of commerce, either into or out of the state." *H.P. Hood & Sons v. Du Mond*, 336 U.S. 525, 535, 69 S.Ct. 657, 663, 93 L.Ed. 865 (1949). In order to ferret out this illicit motive, we are instructed by the Supreme Court to engage in a two-step inquiry when reviewing state statutes for alleged violations of the dormant Commerce Clause. The first step involves determining whether the statute directly burdens interstate commerce or discriminates against out-of-state interests. Discrimination is defined as the "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Oregon Waste Sys. Inc. v. Department of Envtl. Quality of Oregon*, 511 U.S. 93, 99, 114 S.Ct. 1345, 1350, 128 L.Ed.2d 13 (1994). A statute can discriminate against out-of-state interests in three different ways: (a) facially, (b) purposefully, or (c) in practical effect. *Wyoming v. Oklahoma*, 502 U.S. 437, 454–55, 112 S.Ct. 789, 800–01, 117 L.Ed.2d 1 (1992). A statute that is found to be discriminatory, is per se invalid, *id.*, unless the state can demonstrate that it is "demonstrably justified by a valid factor unrelated to economic protectionism." *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 274, 108 S.Ct. 1803, 1808, 100 L.Ed.2d 302 (1988).

If the statute is not discriminatory, we must nevertheless proceed to the second step. In that case, the statute is valid unless the burdens on interstate commerce are "clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970). Having established the legal framework within which this issue must be resolved, we now determine if the challenged provisions of SB 2 offend the requirements of the Commerce Clause.

### C. THE EKR CHALLENGE

As we mentioned *supra*, in order for the challenged provisions of SB 2 to be valid, they must not be discriminatory, and they must survive the *Pike* balancing test. EKR argues that the challenged portions of SB 2 are facially, purposefully, and effectually discriminatory, because they were enacted as regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors.

### 1. FACIAL DISCRIMINATION

■ We first address the contention that KRS 224.40–315 and KRS 224.43–345 are facially discriminatory. State laws that discriminate on their face against interstate commerce are presumptively invalid. *Oregon Waste Sys. Inc. v. Dep't of Envtl. Quality of Ore.*, 511 U.S. 93, 99–100, 114 S.Ct. 1345, 1349–51, 128 L.Ed.2d 13 (1994). This is because these laws are almost always reflective of a state's attempt to isolate itself from the national economy and to protect local economic actors. *Fort Gratiot Sanitary Landfill, Inc. v. Michigan Dep't of Natural Resources*, 504 U.S. 353, 361, 112 S.Ct. 2019, 2024–25, 119 L.Ed.2d 139 (1992).

In *Fort Gratiot*, the Supreme Court held that an amendment to the State of Michigan solid waste program, which facially prohibited landfill developers in Michigan from accepting out-of-state waste, was unconstitutional. *Id.* at 356–59, 112 S.Ct. at 2022–24. The provision stated that: "A person shall not accept for disposal solid waste ... that is not generated in the county in which the disposal area is located unless the acceptance of solid waste ... is explicitly authorized in the approved county solid waste management plan." *Id.* at 357, 112 S.Ct. at 2022. The Court held that the distinction, which burdened out-of-state economic interests in favor

of in-state interests, evidenced Michigan's attempt to isolate itself from the national economy, and to protect local waste producers from competition from out-of-state producers of waste. *Id.* at 361, 112 S.Ct. at 2024–25; *see also Philadelphia v. New Jersey,* 437 U.S. 617, 626–27, 98 S.Ct. 2531, 2536–37, 57 L.Ed.2d 475 (1978); *Oregon Waste Sys.,* 511 U.S. at 96, 114 S.Ct. at 1348 (invalidating an Oregon law on dormant Commerce Clause grounds, which imposed a fee on "every person who disposes of solid waste generated out-of-state"); *Chemical Waste Management v. Hunt,* 504 U.S. 334, 341, 112 S.Ct. 2009, 2013, 119 L.Ed.2d 121 (1992); *Environmental Technology Council v. Sierra Club,* 98 F.3d 774, 785–86 (4th Cir.1996) (holding a South Carolina law which establishes different quotas for out-of-state and in-state waste facially unconstitutional).

In the instant case, EKR argues that the following provision is facially discriminatory. In KRS 224.43–345(1)(*l*), the legislature stated:

> (1) Each area solid waste management plan shall be prepared in accordance with administrative regulations to be adopted by the cabinet and shall be required to include the following:
>
> . . . .
>
> (*l*) Specific provisions to assure that adequate capacity for a ten (10) year period shall be available for municipal solid waste generated in the solid waste management area, and identification of any additional capacity authorized for disposal of out-of-area municipal solid waste.

We disagree with EKR's contention. Although it could be argued that the requirement that local solid waste management plans identify additional capacity for disposal of out-of-area[2] municipal waste is a distinction, it is not a discriminatory distinction.

As we noted *supra,* discrimination, for the purpose of the dormant Commerce Clause, is the "different treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Oregon Waste Sys. Inc. v. Dep't of Envtl. Quality of Oregon,* 511 U.S. 93, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994).

In *Fort Gratiot,* the distinction made by Michigan clearly burdened out-of-state interests because Michigan denied out-of-state actors access to its solid waste market. The distinction also clearly benefitted in-state interests because it provided "local waste producers complete protection from competition from out-of-state waste producers." *Fort Gratiot,* 504 U.S. at 361, 112 S.Ct. at 2024. In this case, assuming arguendo that a distinction is being made between in-state capacity and out-of-state capacity, it cannot be credibly argued that the latter is being burdened. Moreover, it certainly cannot be credibly argued that this facial distinction evidences an attempt by the Commonwealth to isolate local economic actors from interstate competition.[3] Because the statutes are not facially discriminatory, we cannot hold that the challenged provisions are constitutionally infirm on that ground.

2. PURPOSEFUL DISCRIMINATION

■■■ EKR also argues that the challenged provisions purposefully discriminate against out-of-state commerce. It is axiomatic that a state law that purposefully discriminates against out-of-state interests is unconstitutional. *Chemical Waste Management Inc. v. Hunt,* 504 U.S. 334, 344 & n. 6, 112 S.Ct. 2009, 2015 & n. 6, 119 L.Ed.2d 121 (1992); *Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 471 & n. 15, 101 S.Ct. 715, 727–28 & n. 15, 66 L.Ed.2d 659 (1981). The party challenging the validity of the

---

**2.** Although the statute uses the phrase "out-of-area" and not "out-of-state," for our purposes that is a distinction without a difference. The Supreme Court has held that if a statute burdens interstate commerce, the state "cannot avoid the strictures of the Commerce Clause by curtailing the movement of articles of commerce through subdivisions of the State, rather than through the State itself." *Fort Gratiot,* 504 U.S. at 361, 112 S.Ct. at 2024.

**3.** One can easily surmise at least one plausible justification for this distinction. Given that the Commonwealth's waste management plan permits local planning areas to dispose of waste outside of the planning area, this provision is most likely intended to identify areas with the capacity to accept solid waste. Thus, contrary to EKR's contention, this provision, instead of hindering commerce, may serve to better facilitate both intra— and interstate commerce.

regulation has the burden of demonstrating that the regulation has a discriminatory purpose. *Hughes v. Oklahoma*, 441 U.S. 322, 336, 99 S.Ct. 1727, 1736, 60 L.Ed.2d 250 (1979). "There is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes. Often these words are sufficient in and of themselves to determine the purpose of the legislation. In such cases we have followed their plain meaning." *Perry v. Commerce Loan Co.*, 383 U.S. 392, 400, 86 S.Ct. 852, 857, 15 L.Ed.2d 827 (1966); *see also Clover Leaf Creamery Co.*, 449 U.S. at 463, 471 & nn. 7, 15, 101 S.Ct. at 723, 728 & nn. 7, 15 (holding that a state statute does not violate the dormant Commerce Clause because the articulated legislative objectives, which are the actual purposes of the statute, are not discriminatory). *But see Environmental Technology Council v. Sierra Club*, 98 F.3d 774, 785–86 & n. 18 (4th Cir.1996) (holding unconstitutional a state's statute which stated as its purpose to "give preference to hazardous waste generators within" the state); *Alliance For Clean Coal v. Miller*, 44 F.3d 591, 595–96 (7th Cir.1995) (holding Illinois statute which required all coal utilities operating in Illinois to acquire scrubbers "to enable them to continue to burn Illinois coal," as violating the Commerce Clause because stated purpose of statute is "to maintain and preserve ... the mining of coal in Illinois").

The stated purpose of the Commonwealth's waste disposal program is "to provide for the management of solid waste, including reduction, collection, transportation, and disposal in a manner that will protect the public health and welfare, prevent the spread of disease and creation of nuisances, conserve our natural resources, and enhance the beauty and quality of our environment." KRS 224.43–010. As can be readily observed, the purpose of the Commonwealth's waste management program is not to protect local economic actors or to economically isolate the Commonwealth from the rest of the nation.

■ Admittedly, where other sources, other than the state's own self-serving statement of its legislative intent, indicate the

presence of actual and discriminatory purposes, a state's discriminatory purpose can be ascertained from sources. *Chambers Medical Technologies of South Carolina, Inc. v. Bryant*, 52 F.3d 1252, 1259 & n. 10 (4th Cir.1995). However, "[w]here discrimination is not patent on the face of a statute, the party challenging its constitutionality has a more difficult task." *C & A Carbone, Inc. v. Town of Clarkstown, New York*, 511 U.S. 383, 423 & n. 12, 114 S.Ct. 1677, 1699 & n. 12, 128 L.Ed.2d 399 (1994) (Souter, J., dissenting). An apt illustration is provided by *SDDS Inc. v. State of South Dakota*, 47 F.3d 263 (8th Cir.1995).

In *SDDS*, the Eighth Circuit held unconstitutional a South Dakota initiative and referendum on the grounds that they evidenced a discriminatory purpose. There were three pieces of evidence that led that court to its conclusion. First, the court noted that South Dakota changed its political process to make it more difficult for the solid waste disposer to acquire the necessary permit to operate a solid waste disposal facility. *Id.* at 268. Second, in a pamphlet, which served as a voter guide and accompanied the referendum, South Dakota "exhorted voters to vote against the out-of-state dump because South Dakota is not the nation's dumping grounds." *Id.* (internal quotation marks omitted). Third, the court remarked that the fact that the means chosen by South Dakota to effectuate its stated goals were ineffectual, provided further evidence of that State's discriminatory purpose. *Id.* at 268–69.

■ Unfortunately, EKR does not present any such evidence to support its contention that KRS 224.40–315 and KRS 224.43–345 were enacted by the Commonwealth with the purpose of protecting local economic actors from interstate competition. EKR, however, contends that a study on solid waste conducted by the University of Kentucky, which was allegedly requested by then-Governor Wilkinson, is indicative of the Commonwealth's discriminatory motives. Assuming we agree with EKR's assertion that one of the study's principal concerns was how to slow down or prevent the entry of out-of-state garbage into the Commonwealth, EKR still fails to demonstrate that the challenged

provisions were purposefully discriminatory. EKR does not present any evidence to show that the study impacted the legislature, how the study impacted the legislature, or how the study led to the passage of—or even influenced—the challenged provisions. When a party seeks to present circumstantial evidence of discriminatory purpose pursuant to a dormant Commerce Clause challenge, it is the duty of that party to show the effect of that evidence on the challenged statute. *See, e.g., Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 351–53, 97 S.Ct. 2434, 2445–47, 53 L.Ed.2d 383 (1977). In this case, EKR has failed to carry its burden. It has failed to present any evidence which demonstrates that the challenged provisions have a discriminatory purpose. *See Gary D. Peake Excavating, Inc. v. Town Bd. of the Town of Hancock,* 93 F.3d 68, 74 (2nd Cir.1996) (accord). Consequently, we cannot rule in favor of EKR on that ground.

### 3. DISCRIMINATORY EFFECT

■ Even though we do not find that the challenged provisions are either facially or purposefully discriminatory, EKR can nevertheless prevail if it can prove that the challenged provisions have a discriminatory effect. *Brown–Forman Distillers Corp. v. New York State Liquor Auth.,* 476 U.S. 573, 578–579, 106 S.Ct. 2080, 2083–84, 90 L.Ed.2d 552 (1986). A statute which has a discriminatory effect, for Commerce Clause purposes, is a statute which favors in-state economic interests while burdening out-ofstate interests. *See id.* at 57, 106 S.Ct. at 2084 (holding that a statute is discriminatory when its "effect is to favor in-state economic interests over out-of-state interests"). Thus, there are two complementary components to a claim that a statute has a discriminatory effect on interstate commerce: the claimant must show both how local economic actors are favored by the legislation, and how out-of-state actors are burdened by the legislation.

For example, in *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977), the Supreme Court struck down a North Carolina statute which required, inter alia, "all closed containers of apples sold, offered for sale, or shipped into the State to bear no grade other than the applicable U.S. grade or standard." *Id.* at 335, 97 S.Ct. at 2437. The statute was challenged by an association composed of apple growers from Washington state whose purpose it was to advertise Washington-produced apples. *Id* at 336–37, 97 S.Ct. at 2438. The plaintiffs argued that the statute was unconstitutional because of its discriminatory impact on Washington State's apple producers. They maintained that because Washington State-graded apples are recognized by the industry as superior to all other grades, including those of the United States Department of Agriculture, Washington State apple growers will lose the competitive edge that a Washington State grade confers, while at the same time North Carolina's apple growers will be protected from an extremely powerful competitor. They also argued that complying with the North Carolina statute would be extremely costly and inefficient.

The Court agreed. First, the Court explained how the statute burdened out-of-state economic actors. The Court stated that the "first, and most obvious [effect] is the statute's consequence of raising the costs of doing business in the North Carolina market for Washington apple growers and dealers, while leaving those of their North Carolina counterparts unaffected." *Id.* at 350–51, 97 S.Ct. at 2445. Second, the Court demonstrated how the statute benefitted the local economic actors. The Court noted that the statute also had the

> effect of stripping away from the Washington apple industry the competitive and economic advantages it has earned for itself through its expensive inspection and grading system [which] ... has gained nationwide acceptance in the apple trade.... [B]y prohibiting Washington growers and dealers from marketing apples under their State's grades, the statute has a leveling effect which insidiously operates to the advantage of local apple producers.... Such 'downgrading' offers the North Carolina apple industry the very sort of protection against competing out-of-state

products that the Commerce Clause was designed to prohibit.

*Id.* at 351–52, 97 S.Ct. at 2445–46.

In the instant case, EKR does not demonstrate how local economic actors are favored at the expense of out-of state economic actors. It maintains that because local planning areas are not required to provide for a landfill in their areas, a "local Area can forever impede[ ] the development of a landfill proposing to accept out-of-state waste." At oral argument, EKR maintained that the County violated the Commerce Clause because it did not provide for ·a landfill in Magoffin County in its area plan.

Inasmuch as EKR argues that the Commerce Clause required Magoffin County to build a landfill within the County, we emphatically reject that argument.[4] The Commerce Clause is not a safety valve for those who are simply political process losers. As we fully explained, *supra,* unless there is evidence that a state law treats in-state economic interests differently than out-of-state economic interests, that law is valid under the Commerce Clause. Because EKR has failed to make such a showing, we cannot find in their favor.

Additionally, the facts of this case belie EKR's contention that Magoffin County's reason for not adopting EKR's proposed landfill into its area plan is because EKR planned to accept out-of-state garbage at the proposed landfill. As EKR itself admits, in 1991 the Magoffin County Fiscal Court negotiated a contract with EKR in which EKR agreed to construct a landfill that would dispose of the County's waste, as well as accept out-of-state waste. Thus, even though the County knew that EKR planned to accept out-of-state waste, the County nevertheless agreed to EKR's proposed landfill. Moreover, when the first area plan was submitted to the Cabinet, EKR's proposed landfill was included in the plan. When the Cabinet rejected the County's area plan and rewrote a plan for the County, the Cabinet itself

suggested that the County use EKR's proposed landfill. However, the contract between EKR and the County was later declared invalid, the composition of the Fiscal Court changed, and the new members decided to do the expedient and not build a landfill at all in Magoffin County. These events are most likely the predominant, if not only reasons, why EKR did not succeed. Consequently, EKR has failed to show that the County or the Commonwealth acted in a manner that evidences economic protectionism, or that the actions of the State benefitted local economic actors at EKR's expense, or that of other of out-of-state economic actors.

Further evidence which undermine EKR's contention were noted by the district court. The district court found that the amount of out-of-state garbage imported into the Commonwealth nearly doubled from July 1, 1993 to July 1, 1994, rising from approximately 97,000 tons to approximately 193,000 tons, while the number of landfills in the Commonwealth decreased from 70 in 1991, to 30 on June 30, in 1992. Additionally, over the next ten years, the Commonwealth is projecting a total waste disposal capacity of 99 million tons. The Commonwealth is expecting to generate 49 million tons of waste over that same period of time. Thus, over 49 million tons are reserved for out-of-state waste, which will flow into the Commonwealth over the next ten years. Thus, we are unable to find that the challenged provisions have a discriminatory effect on interstate commerce.

### 4. THE PIKE BALANCING TEST

 Even though we do not find that the challenged provisions directly burden interstate commerce or discriminate against out-of-state interests, we must nevertheless determine whether their potential benefits outweigh the burdens that they place on interstate commerce. *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970). As the Court stated in *Pike,* "Where [a] statute regulates even-

---

**4.** EKR's reliance on *GSW Inc. v. Long County, Georgia,* 999 F.2d 1508 (11th Cir.1993) is unavailing. In *GSW,* the defendant-county admitted that it sought to restrict out-of county waste. *Id.* at 1517. The issue in that case was whether the

county's discriminatory actions were justified for reasons other than economic protectionism. This case is clearly distinguishable from *GSW* because we have not found that the Commonwealth discriminated against out-of-state waste.

handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Id.* at 142, 90 S.Ct. at 847. The party challenging the statute bears the burden of proving that the burdens placed on interstate commerce outweigh the benefits that accrue to intrastate commerce. *USA Recycling, Inc. v. Town of Babylon,* 66 F.3d 1272, 1282 (2nd Cir.1995). Having determined that the challenged provisions regulate evenhandedly—that is, that they are not discriminatory—we must now determine if the Commonwealth's interests are legitimate, and if the benefits of the challenged provisions outweigh the burdens, if any, that are placed on interstate commerce.

The Commonwealth's stated interests in promulgating this waste disposal program are to "provide for the management of solid waste, including reduction, collection, transportation, and disposal in a manner that will protect the public health and welfare, prevent the spread of disease and creation of nuisances, conserve our natural resources, and enhance the beauty and quality of [the] environment." KRS 224.43–010. The interests asserted by the Commonwealth are clearly related to the health and welfare of its residents. Legislation which pertains to the public health and welfare has been consistently recognized as being important and legitimate. *Fort Gratiot Sanitary Landfill, Inc. v. Michigan Dep't of Natural Resources,* 504 U.S. 353, 360, 112 S.Ct. 2019, 2024, 119 L.Ed.2d 139 (1992); *Pike,* 397 U.S. at 143, 90 S.Ct. at 847–48.

From the facts presented in this case, it is not clear if the challenged provisions place any incidental burdens on interstate commerce. As noted *supra,* both the County and the Cabinet proposed to use the services of a landfill developer—e.g., EKR—which clearly stated *ex ante,* that it planned to accept out-of-state waste at its proposed landfill. The Cabinet did not appear to believe that the challenged provisions prohibited the acceptance of out-of-state waste into the Commonwealth. There is no evidence in the record that the Cabinet objected to the fact that EKR planned to accept out-of-state waste. EKR does not state what, if any, incidental burdens the Commonwealth's waste disposal program places on interstate commerce. Consequently, based upon the record before us, we find that the Commonwealth's clearly legitimate goals outweigh the burdens, if any, that are placed upon interstate commerce.

## III. CONCLUSION

Because the challenged statutes are not facially or purposefully discriminatory, because they do not have a discriminatory effect, and because we find that the Commonwealth's stated goals outweigh any burdens on interstate commerce, we **AFFIRM** the decision of District Court Judge Joseph M. Hood granting the Commonwealth's motion for summary judgment.