REQUESTED BY: Merton "Cap" Dierks, Nebraska State Senator
You have requested an Attorney General's opinion concerning the constitutionality of the "Agricultural Production Contract Unfair Practices Act", LB 587 and the "Agricultural Production Contract Act", LB 592, (hereinafter, respectively, "the Practices Act" and "the Contract Act"). You specifically ask whether the equal protection clause of either the U.S. or Nebraska Constitution is violated by applying the provisions of these bills to swine and cattle contracts, and, if so, how that problem may be overcome. Further, you ask if the bills would place a burden upon interstate commerce under the commerce clause of the U.S. Constitution.
A brief description of what provisions these bills contain is necessary at this point. The Contract Act has twenty-two sections. The Contract Act essentially requires the following on cattle and swine contracts: a contract must contain a cover sheet with certain disclosures and other items; a contract must state its essential terms, the risks undertaken and must be readable; a party may ask the Attorney General to certify submitted contracts for compliance with the foregoing requirements; a court may reform a contract which violates the foregoing; producers have a three-day-right to cancel a contract; confidentiality clauses in contracts are invalid; a contract must contain a notice period for contract termination; producers have a right to re-instate after a breach; producers have a right to reimbursement for significant capital investments made prior to wrongful termination; all contracts contain an implied promise of good faith; and contractors who chronically violate the foregoing provisions are subject to penalties.
The Practices Act prohibits the following unfair practices in cattle and swine contracts: use of coercion, intimidation, retaliation, threats or termination threats to impose new terms in a contract or to force execution of a contract; interference with or restraining producers from associating; refusal to provide to a producer the data used to determine that producer's contract compensation; refusal to allow producers observation of weights and measures for contract compensation; and the use of a certain producer's performance to measure compensation to remaining producers.
Both bills have enforcement provisions allowing for a private cause of action, and providing for enforcement by the Attorney General.
I. EQUAL PROTECTION
Your first question is whether a potential equal protection argument arises since the Contract Act and Practices Act limit their applicability only to swine and cattle contracts. Recently, Nebraska amended the language in its Constitution to be nearly identical to that contained in the U.S. Const. art. 14. Neb. Const. art. I, § 3 contains the requirement that: "No person shall be deprived of life, liberty or property, without due process of law, nor be denied equal protection of the laws." Since the amendment's passage, the court has stated "The Nebraska Constitution and U.S. Constitution have identical requirements for equal protection challenges." DeCoste v. City of Wahoo,583 N.W.2d 595, 601, 255 Neb. 266, 274 (1998). The analysis here is the same for both the U.S. and Nebraska Constitutions.
Since the Contract Act and the Practices Act both use similar definitions of "contractor" and the same definitions for "producer," we will examine the equal protection implications of those definitions simultaneously for both bills. LB 592 §§ 3(5) 
3(6) and LB 587 §§ 2(5) 2(6). The Contract Act and Practices Act both apply their regulations to contractors and producers entering into marketing or production contracts on cattle or hogs, but do not apply these requirements to any other livestock contracts. Id. Cattle and hog producers would enjoy the protections provided under the two acts, but other farm product producers would not. It is also possible that cattle and hog contractors would claim that they are unfairly burdened by the two acts, while other farm product contractors are not. In either situation, the challenging parties would have the burden of proving that their right to equal protection had been violated. At the threshold, these litigating parties must prove they are being treated differently from "similarly situated" persons.DeCoste, 583 N.W.2d at 601, 255 Neb. at 274.
Cattle and hog producers produce farm products. Neb. Rev. Stat. § 52-1308. While cattle and hogs are listed as farm products along with grains, such as corn, soybeans and wheat, it is not clear that livestock and other farm products are similarly situated. Livestock require different methods of production, different processing methods, and are subject to differing government regulations from grain, fruit, vegetables, nuts, eggs or milk. If city and county jail inmates are not in the same group as state prison inmates for equal protection analysis purposes, as described in State v. Atkins, it is likely that livestock are not so similarly situated with other farm products to be in one "group". Id. However, do cattle and hogs fall into the same "group" as cervine, chickens, goats, horses, mules, turkeys and sheep? The Contract Act mentions "livestock" as the focus in its findings. LB 592 § 1. Livestock is a broadly defined term, but in most statutory definitions it includes cattle, sheep, swine, horses and mules. Neb. Rev. Stat. §§54-183, 54-701.03, 54-1158, 54-1902, 54-2001 and 77-5403(13)(b). There are statutes including poultry under the definition of livestock, Neb. Rev. Stat. § 52-701.03 and 77-5403(13)(b), but it appears from the Nebraska statutory scheme that poultry is generally subject to differing regulations from cattle and hogs. Cattle, sheep, swine, horses and mules are "livestock" pursuant to most Nebraska statutes, and are therefore a similarly situated "group" for equal protection analysis. Further, some courts may determine that poultry should also be included in the "livestock" definition. Producers of livestock other than cattle and hogs are similarly situated to cattle and hog producers, and could likely achieve standing under the equal protection clauses.
Cattle and hog contractors must likewise show they are similarly situated to other livestock contractors. Livestock contractors would appear to be related in the same manner as livestock producers, since both groups are connected by their livestock business. Cattle and hog contractors engage in the slaughter and processing of meats, meat food products and animal products. Poultry, sheep, horse and mule contractors likely do the same types of slaughtering and processing. Cattle and hog contractors are similarly situated to their poultry, sheep, horse and mule contracting counterparts. Consequently, such contractors could likely achieve standing to challenge the two acts as a classification.
If cattle and hog contractors or producers can show they are classified differently than their counterparts by the two acts, then ". . . the inquiry shifts to whether the legislation at issue can survive judicial scrutiny." Atkins, 250 Neb. at 321,549 N.W.2d at 163. "[I]f a statute involves economic or social legislation not implicating a fundamental right or suspect class, courts will ask only whether a rational relationship exists between a legitimate state interest and the statutory means selected by the legislature to accomplish that end. . . . Upon a showing that such a rational relationship exists, courts will uphold the legislation." Schindler v. Department of MotorVehicles, 256 Neb. 782, 784, 593 N.W.2d 295, 298 (1999). Since cattle and hog contractors are not a suspect class, and their fundamental rights are not harmed by the two acts, then the two acts need only withstand a "rational basis" test. The same rational basis test applies to a challenge by producers of livestock other than cattle and hogs for the same reasons.
For the two acts to survive a challenge by producers there must be a "rational basis" for the acts' classifications involving those producers. We cannot state that no rational basis for those classifications exists. For example, cattle and hog producers may comprise a significantly large number of Nebraska livestock operations, while poultry, sheep, horse and mule operations are few. Further, perceived abuses by cattle and hog contractors, but not other contractors, may result in cattle and hog producers needing additional protections. In either case, the benefits of the two acts to cattle and hog producers would likely be construed to be rationally related to the legitimate state interests in protecting the cattle and hog industries.
Similarly, to avoid being stricken as unconstitutional classifications impacting cattle and hog contractors, it must be shown that the two act's requirements on contractors are rationally related to a legitimate state interest. "[S]ocial and economic measures run afoul of the Equal Protection Clause only when the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that a court can only conclude that the Legislature's actions were irrational." Atkins, 250 Neb. at 321,549 N.W.2d at 164. Again, we cannot state that the Legislature has no legitimate state interest that is rationally related to the contract restrictions mandated by the two acts. The same state interests as described for producers could be applied to a challenge by cattle and hog contractors. Cattle and hogs comprise a very large portion of the Nebraska livestock industry, and perceived problems with that industry could harm state interests. "As we have noted in the context of equal protection, when the Legislature seeks to inaugurate reforms in the area of economics or social welfare, it need not choose between attacking every aspect of the problem or not attacking the problem at all." Bergan Mercy Health Sys. v.Haven, ___ N.W.2d ___, 260 Neb. 846, 856 (2000).
In summary, the Contract Act and the Practices Act both create a classification between parties contracting upon cattle or hogs and parties who do not contract for cattle and hogs, whether those parties are either livestock producers or livestock contractors. A litigating producer would have to prove the two acts are not rationally related to a legitimate state interest, resulting in an equal protection clause violation. Similarly, a litigating cattle and hog contractor must prove that the restrictions upon those contractors relative to other livestock contractors are not rationally related to a legitimate state interest. In both cases, the state would likely be able to show that a legitimate state interest is furthered by the two acts requirements. In defending against a rational basis challenge to either Act, it would be helpful for the Legislature to articulate the state interest underlying the legislation.
 II. COMMERCE CLAUSE
Your second question asks whether the Contract Act or the Practices Act would be susceptible to a commerce clause challenge under the U.S. Constitution. The Contract Act and the Practices Act both apply their requirements to cattle and hogs in Nebraska. The definitions for contractors under the two acts are as follows:
 Contractor means a person who in the ordinary course of business purchases cattle or swine in this state through an agricultural contract for purposes of slaughter and processing of meats, meat food products, or animal products for sale or shipment in commerce.
LB 592 § 3(3).
 Contractor means a person who in the ordinary course of business purchases cattle or swine through an agricultural contract for purposes of slaughter and processing of meats, meat food products, or animal products for sale or shipment in commerce.
LB 587 § 2(3).
The requirements of both bills apply to livestock purchased or grown in Nebraska under an agricultural contract. LB 587 § 2(1) LB 592 § 3(1). Specifically, both acts apply to cattle or hogs grown under a production contract, and to cattle and hogs purchased under a marketing contract. LB 587 § 2(4) 2(6), LB 592 § 3(4) 3(6).
The U.S. Constitution requires that: "The Congress shall have power . . . To regulate commerce . . . among the several states." U.S. Const. art. I, § 8, cl. 3. The dormant portion of this clause ". . . prohibits economic protectionism — that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." New Energy Co. of Ind. v.Limbach, 486 U.S. 269, 273-274, 108 S.Ct. 1803, 100 L.Ed.2d 302
(1988). A thorough analysis of the dormant commerce clause is undertaken in some of our prior opinions, which we will not repeat here. Op. Att'y Gen. No. 93029 and Op. Att'y Gen. No. 94026. We note that the approach for reviewing these cases is an analysis of, first, whether the acts are discriminatory or have extraterritorial reach, in which case they are generally per-se invalid. Second, if the acts are not discriminatory or extraterritorial, then the acts must not impose burdens upon interstate commerce which outweigh the putative local benefits. If the acts survive these two tests, they do not offend the "dormant" commerce clause.
The Contract Act and the Practices Act both impose similar restrictions upon out-of-state and in-state contractors. "[I]f the law in question overtly discriminates against interstate commerce, then we will strike the law unless the state or locality can demonstrate `under rigorous scrutiny that it has no other means to advance a legitimate local interest.'" U I Sanitationv. City of Columbus, 205 F.3d 1063, 1067 (8th Cir. 2000), quotingC A Carbone, Inc. v. Town of Clarkson (citations omitted). There is no patent evidence of an attempt to protect in-state contracting parties to the detriment of out-of-state contracting parties in these acts, nor is there any conceivable situation wherein an in-state contractor or producer would be at a competitive advantage over an out-of-state contractor because of these acts. An in-state producer is not likely to be advantaged by these acts, since they apply to in-state producers with cattle or hogs and out-of-state producers with cattle or hogs in Nebraska. It appears that these acts are not overtly discriminatory. The acts do not appear to be per-se discriminatory.
Next, the Contract Act and the Practices Act must not control conduct of parties who are beyond Nebraska's boundaries. "Under the Commerce Clause, a state regulation is per-se invalid when it has `extraterritorial reach,' that is, when the statute has the practical effect of controlling conduct beyond the boundaries of the state." Cotto Waxo Co. v. Williams, 46 F.3d 790, 793 (8th Cir. 1995). The Contract Act and Practices Act both apply to transactions wherein cattle or hogs are purchased, grown or cared for in Nebraska. LB 587 § 2(3) and LB 592 § 3(3). While the Practices Act does not include the words ". . . in this state" which the Contract Act has, the net effect of both bills on cattle or hogs located in Nebraska is the same. Id. Both acts apply to transactions where a Nebraska producer enters into a marketing or production contract with a resident or out-of-state contractor. The Acts appear to apply only to purchase contracts or grower contracts ". . . in this state." Id.
If the acts applied to transactions between producers and contractors who were both out of state, then an extraterritorial reach problem might arise. "A statute has extraterritorial reach when it necessarily requires out-of-state commerce to be conducted according to in-state terms." Cotto Waxo, 46 F.3d at 793. For example, a Wyoming producer could have a production contract with a Colorado contractor, and this Wyoming producer has the cattle under that contract fed by a third-party in Nebraska. The acts do not appear to apply to this out-of-state transaction, but the acts could be made more clear in this regard. If a court did construe both acts to apply to out-of-state transactions like that described, then both acts would be constitutionally suspect. By adding ". . . in this state . . ." to the definitions of marketing and production contracts, then any uncertainty about out-of-state transactions being covered by the acts would be eliminated. For instance, a new definition of marketing contract in both acts could state: "Marketing contract means a written agreement for the purchase of swine or cattle in this state, except a negotiated purchase. . .". (emphasis added). While the acts do not appear to apply to out-of-state transactions, clarifying the acts as suggested would provide more certainty so the acts do not have extraterritorial reach.
Even if these acts are not found to have extraterritorial reach, they must be subjected to scrutiny under the "balancing test". "If each act `regulates even handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.'" United Waste Systems of Iowa, Inc. v.Wilson, 189 F.3d 762, 767-768 (8th Cir. 1999) (quoting Pike v.Bruce Church, 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174
(1970). A challenging party would have a difficult time proving that an actual burden exists upon it which outweighs any putative local benefits to producers, under the Pike v. Bruce Church
"balancing test." The two acts appear to codify certain causes of action in contract and common law, such as unjust enrichment, detrimental reliance and negligent misrepresentation. Since contractors would be subject to similar causes of action in other states, regardless of the existence of either act, contractors would have difficulty proving an additional and excessive burden on them by complying with the acts. Further, contractors would have to show actual burdens, not projected or imagined burdens. It is likely that the putative benefits put forward on behalf of the acts would appear to render incidental, and not excessive, any burdens upon interstate commerce imposed by these acts. Although not clearly adopted by the Eighth Circuit, putative benefits, rather than actual benefits, are the only required showing by a statute's proponent in other circuits. See K-S Pharmacies v.American Home Products, 962 F.2d 728,731 (7th Cir. 1992) EasternKy. Resources v. Fiscal Ct. of Magoffin, 127 F.3d 532 (6th Cir. 1997). In summary, the Contract Act and the Practices Act would likely survive a "dormant" commerce clause challenge as currently written, and would be even more likely to survive a challenge if the suggested language were included in the definitions sections.
III. CONCLUSION
Under equal protection clause analysis, litigating cattle and hog contractors and litigating producers would likely have standing to challenge the Contract Act and Practices Act, since they are similarly situated to their counterparts, and classified under both acts. Since none of the litigating parties are protected classes or have their fundamental rights harmed by the two acts, the acts are subjected only to a "rational basis" test under the equal protection clauses. Neither act provides clear indications of the Legislative intent regarding protections for cattle and hog contracts, but not other livestock contracts. However, there are several conceivable legitimate state interests that would be furthered by the requirements of the two acts. If these or other legitimate state interests were articulated by the text of the acts or their legislative history, we believe that both acts would survive an equal protection challenge by either set of litigating parties.
Your second question asked whether there is a commerce clause violation by the acts. Since neither act appears to favor in-state vs. out-of-state contractors, they are not overtly discriminatory. Both acts apply their provisions to cattle and hogs which are grown or cared for in this state. These acts apply to marketing and production contracts, and could be more clear on whether they impose requirements upon contracts between out-of-state producers and contractors. If a court construes the acts to cover out-of-state transactions, then the act's requirements would be impermissibly projected into other states. However, if the acts clearly applied only to contracts in Nebraska, they would not have extraterritorial reach. The acts are not discriminatory, do not appear to have extraterritorial reach and have benefits outweighing the incidental burdens upon interstate commerce. The acts would not violate the commerce clause.
Sincerely,
 DON STENBERG Attorney General
 William R. Barger Assistant Attorney General
Approved:
______________________________ Attorney General
pc: Patrick J. O'Donnell Clerk of the Legislature