# United States Court of Appeals
## For the First Circuit

No. 05-1259

ALLIANCE OF AUTOMOBILE MANUFACTURERS,
Plaintiff, Appellant,

v.

DAN A. GWADOSKY, IN HIS OFFICIAL CAPACITY AS
SECRETARY OF STATE OF THE STATE OF MAINE, AND G. STEVEN ROWE, IN
HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF THE STATE OF MAINE,
Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. John A. Woodcock, Jr., U.S. District Judge]

Before
Selya, Circuit Judge,
Coffin, Senior Circuit Judge,
and Howard, Circuit Judge.

Russell R. Eggert, with whom Andrew J. Pincus, William L.
Olsen, Mayer, Brown, Rowe & Maw LLP, Harold J. Friedman, Bruce
Hepler, and Friedman, Gaythwaite, Wolf & Leavitt were on brief, for
appellant.
Francis Ackerman, Assistant Attorney General, with whom Paul
Stern, Deputy Attorney General, was on brief, for appellees.
Bruce C. Gerrity, with whom Michael Kaplan and Preti,
Flaherty, Beliveau were on brief, for Maine Auto Dealers
Association, Inc., amicus curiae.

November 18, 2005

**SELYA**, **Circuit Judge**.  This appeal is the latest chapter in an epic struggle between motor vehicle manufacturers and their dealers in the State of Maine.  See Alliance of Auto. Mfrs. v. Gwadosky, 304 F. Supp. 2d 104, 106-09 (D. Me. 2004) [Alliance I] (discussing the historical antecedents).  The controversy centers on reimbursement for warranty work.  Thirty years ago, the state legislature intervened in this tug-of-war to ensure equity and to prevent collateral damage to consumers.  More recently, the legislature amended the state regulatory scheme to prohibit manufacturers from adding state-specific surcharges to wholesale motor vehicle prices in order to recoup the costs of their compliance with retail-rate reimbursement laws (such as the one that the Maine legislature previously had enacted).

The Alliance of Automobile Manufacturers (the Alliance), a national trade association whose members are BMW Group, DaimlerChrysler Corp., Ford Motor Co., General Motors Corp., Mazda North American Operations, Mitsubishi Motors North America, Inc., Porsche Cars North America, Inc., Toyota Motor North America, Inc., and Volkswagen of America, Inc., challenged the recoupment bar as, among other things, a violation of both the Commerce and Contracts Clauses of the United States Constitution.  The district court rejected that binary challenge.  After careful consideration of the claims asserted, we conclude that the Alliance has not made out a genuine issue of material fact as to the existence of a

-2-

constitutional violation.  Consequently, we affirm the judgment below.

## I.  BACKGROUND

The historic relationship between motor vehicle manufacturers and dealers is not a particularly congenial one. See, e.g., Gen. Motors Corp. v. Darling's, 324 F. Supp. 2d 257 (D. Me. 2004), amended in part by 330 F. Supp. 2d 9 (D. Me. 2004); Liberty Lincoln-Mercury, Inc. v. Ford Motor Co., 923 F. Supp. 665 (D.N.J. 1996), aff'd, 134 F.3d 557 (3d Cir. 1998); Darling's v. Ford Motor Co., 825 A.2d 344 (Me. 2003).  The relationship typically flows from a franchise agreement that, in addition to other provisions, requires the dealer to perform warranty repairs (without regard to whether the dealer sold the vehicle in question) and sets out explicit rules for how the manufacturer will reimburse the dealer for that work.

Predictably, warranty reimbursement rates have been a source of considerable friction.  The manufacturers have demanded preferential pricing of warranty repairs as a sort of volume discount.  The dealers have argued that the discounted rate structure not only reflects an excessive imbalance in market power, but also forces them to increase the charges for non-warranty repairs (a practice that effectively requires non-warranty customers to subsidize warranty work).

In 1975, the Maine legislature stepped into this imbroglio and began to regulate the price of warranty repairs within Maine's borders. See 1975 Me. Laws 1788 (codified as amended at Me. Rev. Stat. Ann. tit. 10, § 1176) (mandating that motor vehicle manufacturers compensate dealers "adequately and fairly" for warranty repairs). In its most recent incarnation, enacted in 1991, this provision requires that manufacturers reimburse their Maine dealers for parts and labor at the retail rates customarily charged to non-warranty customers. See Me. Rev. Stat. Ann. tit. 10, § 1176.

In the usual motor vehicle franchise agreement, the manufacturer reserves the right to set wholesale vehicle prices unilaterally.[1] Exercising this right, Ford Motor Co. responded to Maine's amended version of section 1176 by adding a "warranty parity surcharge" to the wholesale price of motor vehicles sold in Maine. This surcharge was designed to recoup the incremental expenses that resulted from retail-rate reimbursement.

Adjudicating a dealer challenge to the surcharge, we held that nothing in Maine's motor vehicle franchise law prohibited it. See Acadia Motors, Inc. v. Ford Motor Co., 44 F.3d 1050, 1055-57 (1st Cir. 1995); see also Acadia Motors, Inc. v. Ford Motor Co.,

---

[1]General Motors' standard franchise agreement is representative of the genre. It declares in pertinent part that "[p]rices, destination charges, and other terms of sale applicable to any Motor Vehicle may be changed at any time."

799 A.2d 1228, 1231 (Me. 2002) (agreeing with this conclusion). In 2002, Ford set its surcharge at $500 per vehicle and collected more than $3,600,000 in additional revenue from Maine dealers. No other manufacturer has, as yet, followed suit.

Once again, the Maine legislature intervened. After several failed attempts at crafting a solution, it passed Legislative Document 1294. That document amended section 1176 by providing in pertinent part that a motor vehicle manufacturer "may not otherwise recover its cost for reimbursing a [dealer] for parts and labor pursuant to this section." L.D. 1294 § 10, 121st Leg., 1st Reg. Sess. (Me. 2003). For simplicity's sake, we refer throughout this opinion to this proviso — section 10 of L.D. 1294 — as the "recoupment bar."

On September 4, 2003, the Alliance filed suit in Maine's federal district court, challenging the recoupment bar as unconstitutional under the Commerce, Contracts, and Takings Clauses. It sought declaratory and injunctive relief and named as defendants Dan A. Gwadosky, in his official capacity as Maine's Secretary of State, and G. Steven Rowe, in his official capacity as Maine's Attorney General (collectively, the State).

The district court allowed the Maine Auto Dealers Association (MADA) a right to participate in the proceedings as an amicus curiae. It proceeded to deny the Alliance's motion for a preliminary injunction, finding that the Alliance had established

neither a likelihood of success on the merits nor irreparable harm. See Alliance I, 304 F. Supp. 2d at 117; see also Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 15 (1st Cir. 1996) (explicating the preliminary injunction standard). As to the Commerce Clause challenge, the court concluded that the recoupment bar did not reflect a discriminatory purpose, did not give rise to a discriminatory effect, and did not have any forbidden extraterritorial reach. See Alliance I, 304 F. Supp. 2d at 110-14. The Contracts Clause challenge was impuissant, the court ruled, because the recoupment bar "was within the reasonable expectations of the parties." Id. at 116.

After limited discovery, the protagonists cross-moved for summary judgment. The district court granted the State's motion and denied the Alliance's motion, essentially for the reasons elucidated in Alliance I. See Alliance of Auto. Mfrs. v. Gwadosky, 353 F. Supp. 2d 97, 99-100 (D. Me. 2005) [Alliance II]. Along the way, the Alliance voluntarily dismissed the Takings Clause claim.[2]

## II. ANALYSIS

On appeal, the Alliance reasserts its position that the recoupment bar violates both the Commerce and Contracts Clauses.

---

[2]The Alliance had challenged another provision of L.D. 1294 on due process grounds. The district court rejected that claim when it granted summary judgment for the State, see Alliance II, 353 F. Supp. 2d at 108-09, and the Alliance does not contest that determination.

We first sketch the familiar summary judgment standard and then deal sequentially with these assertions.

## A.    The Summary Judgment Standard.

A district court may enter summary judgment upon a showing "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). We review orders granting summary judgment de novo; like the district court, we must scrutinize the record in the light most favorable to the summary judgment loser and draw all reasonable inferences therefrom to that party's behoof. Houlton Citizens' Coal. v. Town of Houlton, 175 F.3d 178, 184 (1st Cir. 1999). This standard is not affected by the presence of cross-motions for summary judgment. See Blackie v. Maine, 75 F.3d 716, 721 (1st Cir. 1996).

It is within this procedural framework that we assess the Alliance's claims. Our review is not constrained by the lower court's stated rationale; we may affirm the entry of summary judgment on any ground supported by the record. See Houlton Citizens' Coal., 175 F.3d at 184.

## B.    The Commerce Clause Claims.

The Constitution grants Congress the power "[t]o regulate Commerce . . . among the several States." U.S. Const. art. I, § 8, cl. 3. That grant embodies a negative aspect as well — the "dormant Commerce Clause" — which "prevents state and local

-7-

governments from impeding the free flow of goods from one state to another." Houlton Citizens' Coal., 175 F.3d at 184. Put another way, the dormant Commerce Clause "prohibits protectionist state regulation designed to benefit in-state economic interests by burdening out-of-state competitors." Grant's Dairy-Me., LLC v. Comm'r of Me. Dep't of Agric., Food & Rural Res., 232 F.3d 8, 18 (1st Cir. 2000).

The type of inquiry needed to determine whether a state law transgresses the Commerce Clause varies depending upon the nature of the law at issue. A state statute that purports to regulate commerce occurring wholly beyond the boundaries of the enacting state outstrips the limits of the enacting state's constitutional authority and, therefore, is per se invalid. Pharm. Research & Mfrs. of Am. v. Concannon, 249 F.3d 66, 79 (1st Cir. 2001), aff'd sub nom. Pharm. Research & Mfrs. of Am. v. Walsh, 538 U.S. 644 (2003). A state statute that has no direct extraterritorial reach but that discriminates against interstate commerce on its face, in purpose, or in effect receives a form of strict scrutiny so rigorous that it is usually fatal. This amounts to a "virtually per se invalid rule," id. at 79 (citing Or. Waste Sys., Inc. v. Dep't of Envtl. Quality, 511 U.S. 93, 99 (1994)), under which such a statute is invalid unless it advances a legitimate local purpose that cannot be served by reasonable non-discriminatory means, see id. at 79, 83. A state statute that

"regulates evenhandedly and has only incidental effects on interstate commerce" engenders a lower level of scrutiny. Id. at 80. That analysis entails resort to the balancing test limned in Pike v. Bruce Church, Inc., 397 U.S. 137 (1970): "Where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." Id. at 142.

The Alliance urges that Maine's recoupment bar violates the dormant Commerce Clause in three ways: (i) it was enacted on the wings of a discriminatory purpose, (ii) it has a discriminatory effect, and (iii) it has an impermissible extraterritorial reach that causes consequences beyond Maine's borders. None of these claims corresponds with the third tier of the analytic framework set out above. In all events, the Alliance has expressly waived any theory of liability premised on the Pike balancing test; instead, it has gambled on its theory that the recoupment bar triggers strict scrutiny (and, thus, is per se invalid). See Alliance I, 304 F. Supp. 2d at 114; see also United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) (explaining that arguments not seasonably made are deemed abandoned). Accordingly, we leave Pike to one side.

In the pages that follow, we deal separately with each of the three arguments actually made by the Alliance. Throughout, we keep in mind "[t]he elementary rule . . . that every reasonable construction must be resorted to . . . in order to save a statute from unconstitutionality." Hooper v. California, 155 U.S. 648, 657 (1895).

1. **Discriminatory Purpose**. "The core purpose of the dormant Commerce Clause is to prevent states and their political subdivisions from promulgating protectionist policies." Houlton Citizens Coal., 175 F.3d at 188. "A finding that state legislation constitutes 'economic protectionism' may be made on the basis of either discriminatory purpose or discriminatory effect." Bacchus Imps., Ltd. v. Dias, 468 U.S. 263, 270 (1984) (citations omitted).[3] The Alliance notes that there are no warranty parity surcharges in neighboring New Hampshire and argues, in part, that discriminatory purpose mars the recoupment bar because the Maine legislature passed the law to deprive New Hampshire motor vehicle dealers of

_____

[3]While courts routinely recite this test, see, e.g., Chem. Waste Mgmt., Inc. v. Hunt, 504 U.S. 334, 344 n.6 (1992); Int'l Truck & Engine Corp. v. Bray, 372 F.3d 717, 725 (5th Cir. 2004); Chambers Med. Techs. of S.C., Inc. v. Bryant, 52 F.3d 1252, 1256 (4th Cir. 1995); Old Coach Dev. Corp. v. Tanzman, 881 F.2d 1227, 1231 (3d Cir. 1989), there is some reason to question whether a showing of discriminatory purpose alone will invariably suffice to support a finding of constitutional invalidity under the dormant Commerce Clause. See Kathleen M. Sullivan & Gerald Gunther, Constitutional Law 275 (15th ed. 2004) (recognizing the analytical difficulty that arises because "a law motivated wholly by protectionist intent might fail to produce significant discriminatory effects").

-10-

the competitive advantage derived from paying lower wholesale prices than their Maine counterparts for new cars.

To support its claim of discriminatory purpose, the Alliance points to three bodies of evidence:

- Statements contained in the Report of the Commission to Study the Most Effective Method of Providing Retail Rate Reimbursement for Parts and Labor (the Retail Rate Commission Report), a study commissioned by the Maine legislature and published in December of 2000. Specifically, some Commission members "note[d] . . . the unfair advantage . . . to New Hampshire dealers who [were] not subject to the surcharge." Moreover, "[the majority of the Commission] argue[d] that Maine dealers and consumers should not have to pay more than other buyers in other parts of the country." These statements were made while recommending, among other things, the enactment of a cost-recovery prohibition should negotiations between manufacturers and dealers fail to yield a compromise solution.

- The legislative process that led to passage of the recoupment bar. Specifically, the Maine legislature enacted L.D. 1294 only after the relevant legislative committee twice passed compromise legislation that did not include a cost-recovery prohibition. The first compromise bill, resulting from manufacturer-dealer negotiations, died after MADA withdrew its support. See Comm. Amend. "___" to L.D. 322, 120th Leg., 1st Reg. Sess. (Me. 2001). The same committee also deleted the recoupment-bar language contained in a second (MADA-drafted) bill (L.D. 1294), see Majority Rep. for L.D. 1294, 121st Leg., 1st

-11-

Reg. Sess., at 1 (Me. 2003), but restored it after MADA mounted an intense lobbying campaign. The legislature ultimately enacted that version of the bill into law. See 2003 Me. Laws 1067 (codified at Me. Rev. Stat. Ann. tit. 10, § 1176).

- Materials generated in the course of MADA's lobbying campaign, and, more specifically, the statements of one dealer, John Darling (of the several statements that the Alliance cites, only one is attributable to a dealer other than Darling).[4] In communications with members of the legislature, Darling lobbied in favor of the recoupment bar by emphasizing the price disparity between Maine and New Hampshire and the competition among dealers in the two states. His statements include: "[Maine dealers] don't want cars to cost $500 more in Maine than they do in New Hampshire," "[the cost-recovery prohibition] eliminates the current price disparity between Maine dealers and surrounding states," and "surcharges must be curtailed as they are forcing Maine consumers to buy out-of-state where Ford dealers don't pay a $500 surcharge."

At the outset, we brush aside the questions raised below regarding the Alliance's standing to challenge the law on Commerce Clause grounds. A trade association's standing may derive from its members' standing. See Friends of the Earth, Inc. v. Laidlaw

---

[4]Although Darling was also a member of the Retail Rate Commission, he did not make any of the cited statements in that capacity. Rather, he spoke as a Maine dealer and a member of MADA's board of directors, years after the Commission had concluded its business.

Envtl. Servs. (TOC), Inc., 528 U.S. 167, 181 (2000) (limning requirements for derivative standing). Ford, a member of the Alliance, has suffered concrete pecuniary injury from the recoupment bar. That injury is enough to ground the Alliance's standing to sue even though the Alliance is not a member of the out-of-state class against whom the recoupment bar ostensibly discriminates. See Bacchus Imps., 468 U.S. at 267 (holding that in-state liquor wholesalers had standing to challenge a Hawaii law that allegedly burdened out-of-state liquor producers because the wholesalers suffered economic injury); see also Gen. Motors Corp. v. Tracy, 519 U.S. 278, 286 (1997).

Having confirmed the Alliance's standing, we turn to the merits of the claim. The Alliance, as the party challenging the validity of the recoupment bar, bears the burden of demonstrating that the statute was animated by a discriminatory purpose. See Hughes v. Oklahoma, 441 U.S. 322, 336 (1979). Notwithstanding the generosity inherent in our standard of review — we must assay the facts in the light most flattering to the party against whom summary judgment has been granted, Houlton Citizens' Coal., 175 F.3d at 184 — the Alliance has failed to carry this burden.

The most debilitating weakness in this argument results from the fact that the Alliance loses sight of the forest while searching for trees. The purpose of a statute, like its meaning, must be discerned from the statute as a whole. Thus, context is a

-13-

critically important interpretive tool. See Edwards v. Aquillard, 482 U.S. 578, 594 (1987) ("The plain meaning of the statute's words, enlightened by their context and the contemporaneous legislative history, can control the determination of legislative purpose."). The Alliance's strained attempt to piece together isolated bits of evidence ignores the larger context in which the recoupment bar rests. An assessment of that larger context makes manifest the evident purpose of the recoupment bar.

The recoupment bar is fully integrated into Maine's motor vehicle franchise law. See Me. Rev. Ann. Stat. tit. 10, §§ 1171 to 1190-A. It comprises one sentence of one section of that intricately constructed law — a section that has been on the books, in one form or another, for three decades. See id. § 1176. The rationale for the motor vehicle franchise law can be found within the four corners of the statute itself: its purpose is "to prevent frauds, impositions and other abuses against residents and to protect and preserve the economy, the investments of residents, the public safety and the transportation system of the State." Id. § 1182. Although the legislature adopted this policy in 1997 (before the recoupment bar was even a gleam in its sponsors' eyes), its spirit permeates the statutory scheme and reflects the core purpose of section 1176 (which, of course, had been on the books for over twenty years when the policy statement was adopted).

Seen in this light, it is readily apparent that the overriding legislative objective behind section 1176 was to prevent an unfair price differential between warranty and non-warranty repair work — a differential that the Maine legislature reasonably viewed as detrimental to consumers and motor vehicle dealers alike. Ford's counter — the imposition of the warranty parity surcharge — thwarted this purpose and revealed the existence of a loophole in the retail-rate reimbursement provision. The recoupment bar was a device designed to plug that loophole and restore the structural integrity of section 1176's warranty-reimbursement scheme.

Read in its entirety, the Retail Rate Commission Report confirms this understanding. In the opening sections of that document, the Commission reiterated the root purposes of section 1176: "to protect retail customers" and "to protect Maine automobile dealers from the superior bargaining position of the national manufacturers." The Commission deemed "[t]he current surcharge practices of the manufacturers" as "contrary to the intent of the statute" and premised its consideration of the cost-recovery question on that assumption. Against this background, the Commission's occasional references to the surcharge's competitive impact on Maine motor vehicle dealers are best understood as efforts to highlight a concrete manifestation of the harm attributable to the surcharge, not as statements of legislative purpose.

-15-

The presence of other, less direct evidence reinforces this view. In this regard, the most salient fact is that the recoupment bar is closely tailored to achieve the legislative purpose stated in section 1182. Cf. Hunt v. Wash. State Apple Adver. Comm'n, 432 U.S. 333, 352 (1977) (finding it "somewhat suspect" that the means chosen to effectuate the challenged regulation's "ostensible . . . purpose" were relatively ineffective). The recoupment bar plugs the loophole that Ford was exploiting with perfect precision and ensures that manufacturers, not dealers or consumers, will bear the true cost of retail-rate reimbursement.

The Alliance urges us to look past this larger context based on the tenet that "[l]ess deference to . . . legislative judgment is due . . . where the local regulation bears disproportionately on out-of-state residents and businesses." Kassel v. Consol. Freightways Corp., 450 U.S. 662, 675-76 (1981). That tenet is inapposite here. The Kassel Court's exhortation to look beyond legislative judgments is predicated on the existence of a threshold condition: the statute must bear disproportionately on out-of-state interests. As we soon discuss, see infra Part II(B)(2)-(3), the recoupment bar does not possess so invidious an impact.

At any rate, the legislative process evidence upon which the Alliance relies is indeterminate. As a general rule, statutory

interpretation cannot safely be made to rest upon inferences drawn from intermediate legislative maneuvers. See Trailmobile Co. v. Whirls, 331 U.S. 40, 61 (1947). In this instance, such reliance would be especially problematic because there are countless reasons why the state legislature may have altered its position.

Where, as here, a party presents circumstantial evidence of an allegedly discriminatory purpose in support of a dormant Commerce Clause argument, it is that party's responsibility to show the relationship between the proffered evidence and the challenged statute. See E. Ky. Res. v. Fiscal Court, 127 F.3d 532, 543 (6th Cir. 1997). While statements by a law's private-sector proponents sometimes can shed light on its purpose, see, e.g., S.D. Farm Bureau v. Hazeltine, 340 F.3d 583, 594-95 (8th Cir. 2003), the correspondence of a single lobbyist has little (if any) probative value in demonstrating the objectives of the legislative body as a whole. See, e.g., Bell Atl. Tel. Cos. v. FCC, 131 F.3d 1044, 1048 (D.C. Cir. 1997). This is particularly so when, as in this case, far stronger statements of intent can be gleaned from official legislative sources. See Garcia v. United States, 469 U.S. 70, 76 (1984) (eschewing reliance on the comments of a single legislator and emphasizing that "the authoritative source for finding the Legislature's intent lies in the Committee Reports on the bill").

None of this is to say that the legislature was blind to the plight of Maine's motor vehicle dealers. The record makes

pellucid, however, that if a potential discriminatory purpose was lurking in the background, that purpose was, at most, incidental to the primary purposes that we have identified. Incidental purpose, like incidental effect, cannot suffice to trigger strict scrutiny under the dormant Commerce Clause. Cf. Pike, 397 U.S. at 142 (adhering to a lower level of scrutiny when "effects on interstate commerce are only incidental").

2. **Discriminatory Effect**. We turn next to the Alliance's attempt to demonstrate that the recoupment bar has a discriminatory effect. The Alliance posits that the recoupment bar manifests this pernicious effect in two ways: first, it eliminates the competitive advantage of New Hampshire dealers vis-à-vis Maine dealers; and second, it exports the cost of retail-rate reimbursement nationally to out-of-state dealers. The problem here is practical, not conceptual. After combing the record, we conclude that the Alliance has not put forth sufficient evidence to survive summary judgment with respect to either such effect.

To support its assertion that the recoupment bar has an advantage-stripping effect on New Hampshire dealers, the Alliance relies on one central piece of evidence — a stipulation that "[t]here is some competition between motor vehicle dealers in Maine and motor vehicle dealers in other states." That stipulation, however, bears only a tangential relationship to the Alliance's theories of discriminatory effect. While the Alliance visualizes

-18-

the recoupment bar as "an effort to stem the tide of customers deciding to purchase motor vehicles in New Hampshire rather than Maine," Appellant's Br. at 25,[5] the stipulation supplies no proof of a cross-border "tide." There is likewise no evidence of how Ford's implementation of a warranty parity surcharge may (or may not) have affected interstate competition, nor is there any evidence of the recoupment bar's supposed interference with the competitive process. For all that the record discloses, we could just as easily surmise that any success that New Hampshire dealers may have had in luring Maine customers was premised on, say, better service, a willingness to accept lower profit margins, more convenient locations, or New Hampshire's eschewal of a general statewide sales tax.

To be sure, the Alliance endeavors to bolster the stipulation by reiterating the same amalgam of Retail Rate Commission and lobbyist statements on which it relied in its assertion of discriminatory purpose. For good measure, it adds the observation of a Ford official that state-specific pricing actions "may put [dealers] at a cost disadvantage . . . vis-[à]-vis dealers in bordering states." These augmentations add nothing of substance to the Alliance's claim. At best, they reflect generalizations,

---

[5]All citations to the appellant's brief refer to the version filed under seal.

unsupported by either statistical analysis or concrete facts, about the competitive position of Maine dealers.[6]

As to its contention that the recoupment bar "effectively require[s] that all dealers nationwide fund the additional manufacturer payments associated with warranty repairs in Maine," Appellant's Br. at 35, the Alliance once again relies on a single piece of evidence: this time, the insistence of a General Motors' plenipotentiary that her company cannot absorb costs, but, as a commercial entity, must account for them somehow (such as through national price adjustments).[7] But this statement is a waif in the wilderness. The Alliance adduced no evidence of national vehicle pricing, and nothing in the record illuminates wholesale vehicle

---

[6]In their briefs and at oral argument, the parties devoted much time and energy to New Hampshire's retail-rate reimbursement law. N.H. Rev. Stat. Ann. § 357-C:5(II)(b). Although that statute is similar to Maine's retail-rate reimbursement law, manufacturers have continued to pay for warranty work at discounted rates. Against this background, the State argued that New Hampshire's requirement is mandatory and that the Alliance, by flouting that requirement, improperly fabricated the competitive advantage that it claims Maine law destroys. The Alliance demurs; it interprets New Hampshire's statute as optional, and insists that New Hampshire dealers are simply not submitting claims for retail rates. We need not resolve these conflicting accounts because the Alliance has not presented enough evidence of discriminatory effect to warrant further inquiry into the requirements of New Hampshire law.

[7]It seems odd to rely on General Motors for concrete evidence of the recoupment bar's effects, given that General Motors has never imposed a warranty parity surcharge in Maine. To compound the oddity, the record contains a statement from a representative of Ford that cost absorption is in fact an option and, moreover, an option to which Ford has resorted in the past. Because of the overall paucity of proof, however, we need not explore these curiosities.

prices in Maine, New Hampshire, or elsewhere. By like token, there is not a shred of evidence that speaks reliably to trends in pricing after Maine's enactment of either its retail-rate reimbursement law or the recoupment bar. Finally, the record fails to provide a definitive statement of retail-rate reimbursement costs incurred by manufacturers in Maine for which they allegedly must account.

The proponent of a dormant Commerce Clause claim bears the burden of proof as to discrimination. See Hughes, 441 U.S. at 336. To block summary judgment, the party having the burden of proof on a critical issue must present evidence on that issue that is "significantly probative," not "merely colorable." Cadle Co. v. Hayes, 116 F.3d 957, 960 (1st Cir. 1997) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986)). The Alliance has not satisfied that requirement here; it has offered only prognostications woven from the gossamer strands of speculation and surmise, unaccompanied by any significantly probative evidence of either advantage-stripping or cost-exportation. That is inadequate to make out a genuine issue of material fact.[8] See Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990) (explaining that "conclusory allegations, improbable inferences,

---

[8]Because the Alliance has failed in its proof, we need not decide whether its legal theories of discriminatory effect, if adequately supported by probative evidence, would suffice to trigger strict scrutiny.

and unsupported speculation" are entitled to no weight in the summary judgment calculus).

     **3.    <u>Extraterritorial Reach</u>**.    The Alliance's final Commerce Clause claim is that the recoupment bar has an exterritorial reach that produces a constitutional infirmity. This claim rests on the premise that the recoupment bar has the impermissible "practical effect of tying the wholesale price of motor vehicles in Maine to the wholesale price of identical motor vehicles outside of Maine" by making "the wholesale price of motor vehicles in Maine the minimum wholesale price in the 49 other states." Appellant's Br. at 39-40. Despite this bold declaration, the Alliance adduced no probative evidence of price-tying below. On appeal, it rehashes yet again the same evidence that it offered in connection with discriminatory purpose and adds one weapon to its armamentarium — the suggestion of a Commission member that Maine "should move into law that manufacturers may not charge a different price to Maine dealers."

     These statements (all of which were made well before the legislature acted) tell us nothing about either the recoupment bar's reach or its <u>actual</u> effect on national pricing. Furthermore, the record reflects, and the Alliance itself acknowledges, that manufacturers add state-specific surcharges to motor vehicle wholesale prices for a wide variety of reasons (e.g., some manufacturers impose a California-specific surcharge to recover

-22-

costs associated with that state's environmental regulations). This potential still exists for motor vehicles sold in Maine; nothing in Maine law prevents automobile manufacturers from adjusting their wholesale prices based on transportation costs, labor costs, or the like. There is only one limitation: manufacturers cannot use surcharges to recover warranty-reimbursement costs (and, thus, to frustrate the purpose of Maine's retail-rate reimbursement statute). Like the elephant in the parlor, the implications of this conclusion are too obvious to ignore. The recoupment bar does not transform Maine prices into national minimum prices because automobile manufacturers retain the ability to adjust those prices for any reason save one.

On this sparse record, our extraterritorial-reach inquiry is short and to the point. The inference that the Alliance would have us draw is simply too much of a stretch. In view of this shortcoming and because the Alliance has not provided any other, more reliable proof of the price-tying allegedly associated with the recoupment bar, the lower court did not err in entering summary judgment on the extraterritorial reach claim. See Fed. R. Civ. P. 56(c). Consequently, there is no cause to engage the Alliance's legal theory.

## C. **The Contracts Clause Claim**.

The Alliance also attacks the recoupment bar on a second front. It argues that Maine, in derogation of the Contracts

-23-

Clause, has trespassed on manufacturers' franchise agreements by eliminating components of the manufacturers' pricing discretion.

The Contracts Clause declares that: "No State shall . . . pass any . . . Law impairing the Obligation of Contracts . . . ." U.S. Const. art. I, § 10, cl. 1. Though seemingly absolute in its prohibition, the Contracts Clause "must be accommodated to the inherent police power of the State 'to safeguard the vital interest of its people.'" Energy Reserves Group, Inc. v. Kan. Power & Light Co., 459 U.S. 400, 410 (1983) (quoting Home Bldg. & Loan Ass'n v. Blaisdell, 290 U.S. 398, 434 (1934)).

To determine whether the Contracts Clause is implicated, a reviewing court first must ask "whether the state law has, in fact, operated as a substantial impairment of a contractual relationship." Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 244 (1978). This inquiry elicits an affirmative answer only if "a contractual relationship exists, that relationship is impaired by a change in the law, and the resultant impairment is substantial." Houlton Citizens' Coal., 175 F.3d at 190. The first two of these three factors are often easily satisfied, and this case falls into that pattern: automobile manufacturers typically have franchise agreements with dealers that reserve the right to set wholesale motor vehicle prices unilaterally, see supra note 1, and the recoupment bar now restricts their ability to exercise that

-24-

right. The question of substantial impairment is, therefore, dispositive.

The parties' reasonable expectations are central to the issue of substantiality. In that regard, it is especially important whether or not the parties have been operating in a regulated industry. Energy Reserves, 459 U.S. at 413; Houlton Citizens' Coal., 175 F.3d at 190. Maine has heavily regulated the manufacturer-dealer franchise relationship, including warranty reimbursement rates, since 1975. See 1975 Me. Laws 1732-39 (codified as amended at Me. Rev. Stat. Ann. tit. 10, §§ 1171 to 1190-A); see also Alliance I, 304 F. Supp. 2d at 115. The recoupment bar — a necessary means to effectuate the State's warranty reimbursement policy — was a foreseeable addition to that regulatory regime. It was, therefore, permissible under the Contracts Clause. After all, if the Contracts Clause allows a State to dictate the price of warranty repairs in the first instance, it perforce allows the State to require that the manufacturer, rather than the dealer or the consumer, absorb the true cost of those repairs. Cf. Exxon Corp. v. Eagerton, 462 U.S. 176, 194 (1983) (holding that a State that regulates the price of a commodity may require the sellers to "absorb a tax increase themselves rather than pass it through to their consumers").

It follows inexorably, as night follows day, that the recoupment bar did not substantially impair franchise agreements

entered after 1975.  Those franchise agreements were executed with the knowledge and expectation of pervasive state regulation.

As to franchise agreements entered before 1975 — the record reveals no fewer than six that fit into that taxonomy — our inquiry continues.  As to those agreements, we ask "whether the impairment, albeit substantial, is reasonable and necessary to fulfill an important public purpose."  McGrath v. R.I. Ret. Bd., 88 F.3d 12, 16 (1st Cir. 1996).  The public purpose requirement ensures that the State is exercising its police power and not catering to special interests.  See Energy Reserves, 459 U.S. at 412.

As we have said, Maine's legislature passed the recoupment bar as a consumer- and dealer-protection measure to plug a loophole in, and better effectuate the goals of, the state's retail-rate reimbursement law.  See supra Part II(B)(1).  That rationale brings the recoupment bar squarely within the category of remedies to generalized social or economic problems that constitute legitimate subjects for legislation, notwithstanding the imperatives of the Contracts Clause.  See Energy Reserves, 459 U.S. at 411-12; see also Greenwood Trust Co. v. Massachusetts, 971 F.2d 818, 828 (1st Cir. 1992) (describing "consumer protection" as a "subject[] over which the states have traditionally exercised their police powers").

The Alliance tries to parry this thrust by characterizing the recoupment bar as a direct adjustment of manufacturers' and dealers' contractual rights. That characterization elevates hope over reason. In each of the cases on which the Alliance relies, the reviewing court found no credible evidence of a legitimate public purpose. See Equip. Mfrs. Inst. v. Janklow, 300 F.3d 842, 860-61 (8th Cir. 2002) (noting that "both the State and the [defendant] concede that the Act's purpose is to level the playing field between manufacturers and dealers" and that there was no evidence of any significant public purpose); McDonald's Corp. v. Nelson, 822 F. Supp. 597, 608-09 (S.D. Iowa 1993) (pointing out that "the articulated overall purpose of the Act is specifically to adjust the balance of power between the contracting parties" and that the Act implicated no broad societal interest). As we already have explained, Maine's recoupment bar aspires to protect consumers as well as dealers. Its purpose is much broader than a simple reallocation of existing contractual rights and, thus, that purpose qualifies as significant, legitimate, and public. See Energy Reserves, 459 U.S. at 411-12 & n.13.

When, as in this instance, the State is not a party to a contract, courts ordinarily defer, within broad limits, to the legislature's judgment about the reasonableness and necessity of a particular measure. See id. at 412-13. Given the recoupment bar's evident purpose and the legislature's careful tailoring of it to

fit that purpose, we are constrained to follow that praxis here. We hold, therefore, that the recoupment bar passes muster under the Contracts Clause as to both pre-1975 and post-1975 franchise agreements.

## III.   CONCLUSION

Refined to bare essence, this appeal involves a policy decision by the Maine legislature to prevent motor vehicle manufacturers from imposing compulsory discounts on dealers who perform warranty repairs.  In the case of a particular manufacturer, that policy decision was negated by a warranty parity surcharge added to the wholesale price of all vehicles sold to Maine dealers.  The legislature countered by enacting the recoupment bar as a means of plugging the loophole and restoring the structural integrity of its original policy.  The Alliance strives to characterize this wholly Maine sequence of events as a deprivation of an out-of-state competitive advantage, a cost-exporting scheme, or a price-tying mechanism.  To advance such a characterization is tantamount to saying that when a State resolves to prevent or correct a practice pursued by a manufacturer, which it reasonably has determined is contrary to its declared public policy, it must force its own citizens rather than the errant manufacturer to bear the cost.  The Constitution does not require so Kafkaesque a scenario.  Thus, we hold that the Alliance's Commerce Clause claims are without merit.

The Alliance's attempt to dress this case in the raiment of a Contracts Clause violation fares no better. Maine heavily regulates franchise agreements between motor vehicle manufacturers and dealers, and the recoupment bar does not impermissibly impinge upon those agreements.

We need go no further. The upshot is that the district court's grant of summary judgment in favor of the State was entirely correct.

**Affirmed**.